UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

PRIME INSURANCE SYNDICATE, INC.,

    Plaintiff,

v.

HERBERT DAMASO; EMILIE DAMASO; and CLEVELAND REST HOME,

    Defendants.

2:06-CV-00503-PMP-GWF

O R D E R

Presently before the Court is Plaintiff Prime Insurance Syndicate, Inc.'s ("Prime") Motion for Summary Judgment (Doc. #17) filed on October 3, 2006. On October 23, 2006, Defendants filed an Opposition to Prime's Motion for Summary Judgment (Doc. #22). Prime filed a Reply (Doc. #24) on November 6, 2006. On November 9, 2006, Defendants filed a Supplement to their Opposition (Doc. #25). Prime filed a Supplement to its Reply in Support of Motion for Summary Judgment (Doc. #32) on December 7, 2006. On December 15, 2006, Defendants filed an Opposition to Prime's Supplement to its Reply (Doc. #34). Finally, on December 28, 2006, Prime filed a Reply (Doc. #39) in support of its supplement.

**I.       BACKGROUND**

Defendants Herbert and Emilie Damaso, owners of Defendant Cleveland Rest Home, procured a professional liability insurance policy from Prime for the period of September 19, 2003 to September 19, 2004. (Defs.' Opp'n to Prime's Mot. for Summ. J,

Ex. 10 ["First Policy"].)  At the top of the first page of the policy it states:

> THIS POLICY . . . DIFFERS SIGNIFICANTLY FROM THE LIABILITY COVERAGE OFFERED BY OTHER INSURANCE COMPANIES.  IT IS WRITTEN ON A CLAIMS MADE BASIS.  COVERAGE IS PROVIDED ONLY FOR OTHERWISE COVERED CLAIMS:
>
> (1) WHICH ARE FIRST MADE AGAINST YOU DURING THE POLICY PERIOD; and
> (2) WHICH RESULT FROM WRONGFUL ACTS DURING THE POLICY PERIOD[.]

(Id.)  On October 27, 2004, Prime issued a new insurance policy to Defendants ("Second Policy") to cover the period of October 27, 2004 to October 27, 2005.  (Defs.' Opp'n to Prime's Mot. for Summ. J., Ex. 12.)  The Second Policy contains restrictive language similar to the First Policy.  The Second Policy states:

> THIS HEALTHCARE SERVICES PROFESSIONAL LIABILITY INSURANCE POLICY ("Policy") differs significantly from claims made or occurrence-type general liability policies offered by other insurance companies.  It is a manuscript policy with very strict reporting requirements . . . .  Coverage is provided only for otherwise covered Claims:
>
> (1) Which are first made against an Insured during the Policy Period, and
> (2) Which result from a Wrongful Act occurring during the Policy Period, and
> (3) For which written notice is given to the Insurer during the Policy Period.

(Id.)  Prime cancelled the Second Policy on February 18, 2005.  (Prime's Reply to Defs.' Opp'n to Prime's Mot. for Summ. J., Ex. 6.)

On March 14, 2004, Mary Jane Stewart ("Stewart") died while in the care of Defendants' facility.  (Prime's Mot. for Summ. J. at 3; Defs.' Opp'n to Prime's Mot. for Summ. J. at 2.)  Stewart's estate filed a complaint against Defendants in State Court on July

19, 2005, alleging negligence and gross negligence.[1] (Prime's Mot. for Summ. J., Ex. B; Defs.' Opp'n to Prime's Mot. for Summ. J., Ex. 2.)

On July 27, 2005, Defendants reported the claim relating to Stewart's death to Prime. (Prime's Mot. for Summ. J. at 5; Defs.' Opp'n to Prime's Mot. for Summ. J. at 2.) The following day, Prime notified Defendants it was denying coverage for the claim. (Prime's Mot. for Summ. J. at 5; Defs.' Opp'n to Prime's Mot. for Summ. J. at 2.) On February 21, 2006, Defendants' attorney advised Prime that Defendants would hold Prime responsible for any liability arising from the claim and would pursue legal action against Prime if Prime failed to provide a defense or coverage for the claim. (Defs.' Opp'n to Prime's Mot. for Summ. J., Ex. 5.) On March 6, 2006, Prime's counsel notified Defendants' counsel that it was representing Prime with respect to the claim at issue. (Defs.' Opp'n to Prime's Mot. for Summ. J., Ex. 6.) In response, on March 9, 2006, Defendants' counsel sent correspondence to Prime's counsel requesting another review of Prime's denial of coverage. (Defs.' Opp'n to Prime's Mot. for Summ. J., Ex. 7.)

On March 20, 2006, Defendants' counsel sent correspondence to Prime's counsel enclosing a billing ledger for costs and attorneys' fees totaling $5,226.56 that Defendants had incurred as a result of defending against the claim in state court. (Defs.' Opp'n to Prime's Mot. for Summ. J., Ex. 8.) On April 24, 2006, Prime filed the instant action seeking declaratory judgment regarding Prime's non-coverage of the claim under the First and Second Policies. The next day, Prime sent a check in the amount of $5,226.56 to Defendants' counsel representing payment of Defendants' invoice. (Defs.' Opp'n to Prime's Mot. for Summ. J., Ex. 9.)

---

[1] Both parties acknowledge the state court action was dismissed in March 2006 but subsequently re-filed in May 2006.

3

1  Prime moves for summary judgment arguing there is no genuine issue of material
2  fact and it is entitled to judgment as a matter of law because the insurance policies are
3  unambiguous and enforceable. In response, Defendants urge the Court to deny Prime's
4  motion for summary judgment contending Prime has not properly authenticated its exhibits,
5  genuine issues of material fact still remain, further discovery is needed, the insurance
6  policies are void as against public policy under Nevada law, and Prime's payment of
7  Defendants' fees and costs show that Prime changed its mind and decided to provide
8  coverage for the claim.

**II.   LEGAL STANDARD**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" demonstrate "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law defines which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All justifiable inferences must be viewed in the light most favorable to the non-moving party. County of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1154 (9th Cir. 2001).

The party moving for summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. Fairbank v. Wunderman Cato Johnson, 212 F.3d 528, 531 (9th Cir. 2000). The burden then shifts to the non-moving party to go beyond the pleadings and set forth specific facts demonstrating there is a genuine issue for trial. Id.; Far Out Prods., Inc. v. Oskar, 247 F.3d 986, 997 (9th Cir. 2001).

**III.  DISCUSSION**

   **A.  Authentication of Exhibits**

Defendants argue this Court should deny Prime's motion for summary judgment because Prime failed to attach an affidavit to its motion supporting the factual allegations set forth therein. In response, Prime attached an affidavit to its Reply asserting that the

4

exhibits attached thereto are true and correct.

Documents which are not properly authenticated cannot support a summary judgment motion. See Cristobal v. Siegel, 26 F.3d 1488, 1494 (9th Cir. 1994) (citing Canada v. Blain's Helicopters, Inc., 831 F.2d 920, 925 (9th Cir. 1987)). "Authentication is a condition precedent to admissibility, and this condition is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Evid. 901(a) (quotation and footnote omitted). The decision to exclude evidence lies within the district court's discretion. Id.

The proponent of evidence must make a prima facie showing of authenticity such that a reasonable juror could find in favor of authenticity. U.S. v. Chu Kong Yin, 935 F.2d 990, 996 (9th Cir. 1991). Pursuant to Federal Rule of Civil Procedure 56(e), documents authenticated through personal knowledge must be "attached to an affidavit that meets the requirements of [Fed. R. Civ. P.] 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." Orr, 285 F.3d at 774 (quotation omitted). Accordingly, an affiant who authenticates documents through personal knowledge must be a person "who wrote it, signed it, used it, or saw others do so." Id. n.8 (quotation omitted). In addition, documents produced by a party in discovery are considered authentic when a party-opponent offers them. See id. at 777 n.20. Moreover, "when a document has been authenticated by a party, the requirement of authenticity is satisfied as to that document with regards to all parties . . . ." Id. at 776.

A court also may review a document's contents together with the circumstances of its discovery and make its own determination regarding the evidence's authenticity. Alexander Dawson, Inc. v. N.L.R.B., 586 F.2d 1300, 1302 (9th Cir. 1978); see also Fed. R. Evid. 901(b)(4) (permitting authentication based upon the exhibit's "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with

circumstances"). Additionally, a party may authenticate an exhibit by any means listed in Federal Rules of Evidence 901(b) and 902. See Fed. R. Evid. 901(b) (providing ten approaches to authentication such as voice identification, public records, data compilations, and nonexpert opinions on handwriting); Fed. R. Evid. 902 (self-authenticating evidence such as public documents under seal, certified copies of public records, newspapers, and acknowledged documents). While evidence must be authenticated before the court considers it, it does not have to be authenticated with the motion for which it is being used. See Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1550-51 (9th Cir. 1990) (holding that the district court's improper admission of an unauthenticated registration statement was harmless because the proponent of the registration statement later properly authenticated the statement in a motion to reconsider).

Prime's counsel's affidavit asserting personal knowledge with respect to the veracity of Prime's exhibits does not properly authenticate exhibits 1 through 12 because Prime's counsel is not a witness through whom these exhibits could be introduced at trial. Prime's counsel's affidavit properly authenticates exhibits 13 and 14 because Primes's counsel wrote the letters contained in those exhibits. However, the Court will consider Prime's exhibits 1, 4, 6, 7, 8, 10, 11, and 12 under Federal Rule of Evidence 901(b)(4) because Defendants neither challenge the authenticity of any of Prime's exhibits nor the facts contained therein, and because the exhibits' appearance and contents support authentication. Furthermore, because Defendants attached identical copies of Prime's exhibits 2, 3, 5, and 9 to its Opposition, the Court will also consider these exhibits.

**B. Rule 56(f)**

Defendants argue summary judgment is premature because there are genuine issues of material fact that need to be further developed through discovery. While "Federal Rule of Civil Procedure 56(f) provides a device for litigants to avoid summary judgment when they have not had sufficient time to develop affirmative evidence[,]" a litigant seeking

further discovery under Rule 56(f) bears the burden of identifying "by affidavit the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment." United States v. Kitsap Physicians Serv., 314 F.3d 995, 1000 (9th Cir. 2002); Tatum v. City & County of San Francisco, 441 F.3d 1090, 1100 (9th Cir. 2006). The Court will deny Defendants' request for further discovery because they failed to attach a Rule 56(f) affidavit identifying the specific facts further discovery would reveal and explaining why those facts would preclude summary judgment.[2]

### C. Choice of Law

Defendants argue that despite the policies' terms specifying that the policies conform to Illinois law, Nevada law should govern the interpretation and enforceability of the policies in this case. Prime responds that the policies are enforceable under either Illinois law or Nevada law.

When sitting in diversity, a federal court is obligated to apply the substantive law of the forum state in which it sits, including the forum state's choice of law provisions. Klaxon v. Stentor Elect. Mfg., Inc., 313 U.S. 487, 496 (1941). In Nevada, a contract's choice of law provision controls if the parties to the contract (1) "acted in good faith and not to evade the law of the real situs of the contract"; (2) the chosen state has a substantial relation to the transaction; and (3) the agreement is not contrary to the public policy of the forum. Ferdie Sievers and Lake Tahoe Land Co., Inc. v. Diversified Mortgage Investors,

---

[2] Defendants also argue genuine issues of material fact currently exist with respect to the date Stewart died and whether the First Policy required Defendants to give notice of a potential claim within 72 hours or 14 days. Defendants point to a mistake in Prime's motion for summary judgment wherein Prime incorrectly states Stewart died on March 8, 2004, the date she was admitted into Cleveland Rest Home, instead of March 14, 2004, the date she actually died. This is not a material issue of fact because neither side disputes Stewart died on March 14, 2004 and whether Stewart died on March 8 or March 14 is immaterial because both dates fall under the First Policy's policy period. Moreover, whether the First Policy required Defendants to give notice of a potential claim within 72 hours or 14 days is immaterial because it is undisputed Defendants never gave Prime notice of any potential claim arising from Stewart's death under either time period.

603 P.2d 270, 273 (Nev. 1979).  Factors the Nevada Supreme Court considers in determining whether a state has a substantial relationship to an insurance contract include "a. the place of contracting, b. the place of negotiation of the contract, c. the place of performance, d. the location of the subject matter of the contract, and e. the domicile, residence, nationality, place of incorporation and place of business of the parties." Williams v. United Servs. Auto Ass'n, 849 P.2d 265, 266 (Nev. 1993).

> The "Declarations" pages of the insurance policies state:
>
> Insurance coverage hereunder is provided to the named insured or reinsured through the facilities of INEX . . . and is issued in accordance with Article V 1/2 of the Illinois Insurance Code and the INEX regulations.  Coverage is provided solely by the underwriting syndicate(s) listed herein.  INEX itself is not an insurer and, accordingly, is not a party to the contract and has no liability hereunder.

(Defs.' Opp'n to Prime's Mot. for Summ. J., Exs. 10, 12.)  Although this paragraph states that the policies conform to Illinois law, it does not expressly choose Illinois law to govern any future disputes relating to the policies and there is no evidence to suggest the parties intended this paragraph to be a choice of law provision.  However, even if the parties intended for Illinois law to govern, the choice of law provision is invalid because Illinois does not have a substantial relation to the transaction.  It is undisputed Defendants applied for the liability insurance in Nevada and used a Nevada insurance broker.  Moreover, the subject matter of the policies were in Nevada, and Defendants are domiciled and reside in Nevada.  Prime's incorporation in Illinois is the only evidence indicating a relation to that state.  (See Prime's Reply to Defs.' Opp'n to Prime's Mot. for Summ. J., Ex. 12.)  In fact, the Declarations pages indicate that the office issuing the policy was located in Sandy, Utah, not Illinois. (Defs.' Opp'n to Prime's Mot. for Summ. J. Exs. 10, 12.)  Furthermore, much, if not all of the correspondence from Prime to Defendants came from Prime's Sandy, Utah office.  Thus, because there is no evidence demonstrating Illinois has a substantial relation to the parties' insurance contract, the Court will apply Nevada law.

### D. Insurance Policies' Enforceability & Coverage

#### 1. Enforceability

Defendants argue the insurance policies are unenforceable because they are void as against public policy. Specifically, Defendants argue the policies are "patently unfair" and contrary to the reasonable expectations of a person seeking liability insurance. Prime responds that the insurance policies are enforceable because the terms are clear and unambiguous and Nevada recognizes "claims-made" insurance policies.

In Nevada, courts must enforce insurance contracts as written to effectuate the parties' intent unless doing so will violate public policy. Farmers Ins. Exch. v. Neal, 64 P.3d 472, 473 (Nev. 2003); Nelson v. Cal. State Auto. Ass'n Inter-Ins. Bureau, 956 P.2d 803, 805 (Nev. 1998). Nevada courts view a policy's language "from the perspective of one not trained in law and give plain and ordinary meaning to the terms." Farmers Ins. Exch., 64 P.3d at 472 (quotations omitted). Because an insurance policy is a contract of adhesion, courts broadly interpret the policy's language to afford the insured the greatest possible coverage. United Nat'l Ins. Co. v. Frontier Ins. Co., 99 P.3d 1153, 1156-57 (Nev. 2004). "An insurance policy may restrict coverage only if the policy's language clearly and distinctly communicates to the insured the nature of the limitation." Id. (quotation omitted). Nevada construes any ambiguity or uncertainty in an insurance policy against the insurer and in favor of the insured. Id. However, Nevada courts will not rewrite unambiguous provisions or increase the insurer's obligation to the insured where the parties intentionally and unambiguously limited coverage. Id. at 1157. "The question of whether an insurance policy is ambiguous turns on whether it creates reasonable expectations of coverage as drafted." Id.

Under Nevada law, a "claims-made" insurance policy is "a policy of professional liability insurance that provides coverage only for claims that arise from incidents or events which occur while the policy is in force and which are reported to the insurer while the

policy is in force." Nev. Rev. Stat. § 690B.210.  On the other hand, an "occurrence" policy generally protects the insured from liability for any act or omission occurring during the policy period, irrespective of when the claim is brought.  See e.g. United Nat'l, 99 P.3d at 1155.

Claims-made insurance policies that are clear and unambiguous do not violate Nevada public policy because no prohibition against claims-made policies exists in Nevada and Nevada law specifically recognizes and defines "claims-made" policies.  Here, the insurance policies at issue do not violate public policy because the policies' language restricting coverage on a "claims-made" basis is clear and unambiguous.  At the top of the first page of the First Policy it states:

> THIS POLICY . . . DIFFERS SIGNIFICANTLY FROM THE LIABILITY COVERAGE OFFERED BY OTHER INSURANCE COMPANIES.  IT IS WRITTEN ON A CLAIMS MADE BASIS.  COVERAGE IS PROVIDED ONLY FOR OTHERWISE COVERED CLAIMS:
>
> (1) WHICH ARE FIRST MADE AGAINST YOU DURING THE POLICY PERIOD; and
> (2) WHICH RESULT FROM WRONGFUL ACTS DURING THE POLICY PERIOD[.]
>
> . . . . VARIOUS PROVISIONS OF THE POLICY RESTRICT AND LIMIT THE COVERAGE PROVIDED.  READ THE POLICY AND ALL ENDORSEMENTS CAREFULLY TO DETERMINE YOUR RIGHTS AND DUTIES AND WHAT IS AND IS NOT COVERED.

(Defs.' Opp'n to Prime's Mot. for Summ. J, Ex. 10.)  These terms appear again under the "Coverage Agreement" section of the policy.  (Id.)  The term "claim" is defined as "a written demand seeking damages from the Insured and alleging wrongful acts covered by this Policy arising from services related to Nursing Home Care."  (Id.)  The policy defines "policy period" as "that period of time specified in the Declarations[,]" which in the First Policy is from September 19, 2003 to September 19, 2004.  (Id.)

The Second Policy contains restrictive language similar to the First Policy.  The Second Policy states:

> THIS HEALTHCARE SERVICES PROFESSIONAL LIABILITY INSURANCE POLICY ("Policy") differs significantly from claims made or occurrence-type general liability policies offered by other insurance companies. It is a manuscript policy with very strict reporting requirements. . . . Coverage is provided only for otherwise covered Claims:
>
> (1) Which are first made against an Insured during the Policy Period, and
> (2) Which result from a Wrongful Act occurring during the Policy Period, and
> (3) For which written notice is given to the Insurer during the Policy Period.

(Defs.' Opp'n to Prime's Mot. for Summ. J., Ex. 12.)  These terms are set forth again under the policy's "Coverage" section.  (Id.)

Reading these coverage restrictions from the perspective of one not trained in the law does not render these otherwise unambiguous restrictions ambiguous.  Even a liberal reading of the policies does not create a reasonable expectation of coverage for claims reported outside of the policy period.  Consequently, because these "claims-made" policies are clear and unambiguous and distinctly communicate the nature of their coverage limitations, the policies are enforceable under Nevada law.

**2.  Coverage**

The First Policy provided coverage for claims made during the policy period that resulted from wrongful conduct during the policy period.  The First Policy's policy period commenced on September 19, 2003 and ended on September 19, 2004.  It is undisputed the allegedly wrongful conduct resulting in Stewart's death and giving rise to the subject claim occurred in March 2004, which was during the policy period.  However, it likewise is undisputed that Defendants first reported the incident to Prime in July 2005, approximately ten months after the policy period ended.  Consequently, no insurance coverage exists under the First Policy because Defendants did not submit the claim during the policy period.  The fact that Defendants could not have submitted the claim within the policy period because they did not become aware of the claim until July 2005 is irrelevant.  The plain language of the policy requires the insured to submit a claim within the policy period.  While such a

requirement may seem unduly restrictive, Defendants were on notice of the coverage terms and agreed to enter into the insurance contract.

The terms of the Second Policy also provided coverage for claims made during the policy period that resulted from wrongful conduct occurring during the policy period. The Second Policy's policy period commenced on October 27, 2004 and was supposed to end on October 27, 2005, but Prime cancelled it in February 2005 for non-payment of premiums. It is undisputed, however, that the allegedly wrongful conduct resulting in Stewart's death and giving rise to the subject claim occurred in March 2004. Thus, the Second Policy does not provide coverage because the wrongful conduct did not occur during the policy period. Moreover, even if the wrongful conduct had occurred during the Second Policy's policy period, Defendants did not report the claim until July 2005, approximately four months after Prime cancelled the policy. Consequently, no insurance coverage exists under the Second Policy.

### E.  Estoppel, Ratification & Waiver

Defendants argue even if the insurance policies do not offend public policy, Prime should be estopped from denying coverage or compelled to provide coverage under the doctrines of estoppel, ratification and/or waiver. Prime responds that Defendants have not met their burden of proving these affirmative defenses and none of the defenses are applicable to this case.

#### 1. Estoppel

To establish estoppel, a litigant must establish four elements: "(1) the party to be estopped must be apprised of the true facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting estoppel has the right to believe it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; (4) he must have relied to his detriment on the conduct of the party to be estopped." In re Harrison Living Trust, 112 P.3d 1058, 1062 (Nev. 2005). While "detrimental reliance

1  sufficient to create an estoppel does not necessarily require a showing of financial or
2  pecuniary loss[,]" the party asserting estoppel must be able to show it "changed its position"
3  to its detriment.  Alpark Distrib., Inc. v. Poole, 600 P.2d 229, 231 (Nev. 1979); Voorhees v.
4  Spencer, 504 P.2d 1321, 1326 (Nev. 1973).

5        Defendants have not established the elements of estoppel regarding coverage of
6  the subject incident.  Specifically, Defendants have provided no evidence demonstrating
7  Prime intended for Defendants to act upon the payment of the invoice or that Defendants
8  relied to their detriment on Prime's conduct.  Defendants attempt to demonstrate
9  detrimental reliance by asserting "Defendants relied to their detriment on Plaintiff's conduct
10 by trusting that Plaintiff was paying for their defense in the underlying State court action."
11 (Defs.' Opp'n to Prime's Mot. for Summ. J. at 10.)  However, simply "trusting" in Prime's
12 conduct is insufficient under estoppel.  To invoke estoppel, Defendants are required to
13 demonstrate that Prime's payment of the invoice induced them to "change their position" to
14 their detriment, which they have not done.  Consequently, estoppel does not apply.

15       **2.  Ratification**

16       The doctrine of ratification is similar to estoppel except that ratification operates
17 to make a contract legally valid instead of simply preventing a litigant from challenging its
18 validity and does not require a showing of detrimental reliance.  Merrill v. DeMott, 951
19 P.2d 1040, 1044 (Nev. 1997).  "Generally, contract ratification is the adoption of a
20 previously formed contract, notwithstanding a quality that rendered it relatively void and by
21 the very act of ratification that party affirming becomes bound by it and entitled to all
22 proper benefits from it."  Id.

23       Ratification does not apply to this case because Prime does not dispute the
24 validity of the insurance policies.  Rather, Prime asserts the policies are valid and
25 enforceable.  Moreover, Defendants have not shown that the insurance policies were once
26 void or that Prime's payment of Defendants' invoice constituted an adoption of the

previously void insurance policies making them valid. Accordingly, the doctrine of ratification is inapplicable to this case.

### 3. Waiver

Waiver is defined as "the intentional relinquishment of a known right." Santino v. Great Am. Ins. Co., 9 P.2d 1000, 1004 (Nev. 1932). Although "a waiver may be the subject of express agreement, it may also be implied from conduct which evidences an intention to waive a right, or by conduct which is inconsistent with any other intention than to waive a right." McKellar v. McKellar, 871 P.2d 296, 297 (Nev. 1994). Generally, whether a waiver has occurred is a question for the fact-finder. Id. In the insurance context, however, "there is a well established doctrine that waiver and/or estoppel cannot be used to extend the coverage or the scope of the policy." Walker v. Am. Ice Co., 254 F. Supp. 736, 741 (D.D.C. 1966). This doctrine reflects the majority rule. See Creveling v. Gov't Employees Ins. Co., 828 A.2d 229 (Md. 2003) (collecting cases and treatises).

It does not appear Nevada expressly has accepted or rejected the doctrine. Where a state has not addressed a particular issue, a federal court must use its best judgment to predict how the highest state court would resolve it "using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." Strother v. S. Cal. Permanente Med. Group, 79 F.3d 859, 865 (9th Cir. 1996) (quotation omitted); Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc., 306 F.3d 806, 812 (9th Cir. 2002). In making that prediction, federal courts look to existing state law without predicting potential changes in that law. Moore v. R.G. Indus., Inc., 789 F.2d 1326, 1327 (9th Cir. 1986). Although federal courts should not predict changes in a state's law, they "are not precluded from affording relief simply because neither the state Supreme Court nor the state legislature has enunciated a clear rule governing a particular type of controversy." Air-Sea Forwarders, Inc. v. Air Asia Co., 880 F.2d 176, 186 (9th Cir. 1989) (quotation omitted).

The Court concludes Nevada would follow the majority rule, which does not allow a litigant to use waiver to extend the coverage or scope of an insurance policy to include claims expressly excluded from the contract. Relevant Nevada law supports the Court's conclusion. In <u>Vitale v. Jefferson Ins. Co.</u>, the Nevada Supreme Court stated it would "neither rewrite unambiguous insurance provisions nor attempt to increase the legal obligations of the parties where the parties intentionally limited such obligation." 5 P.3d 1054, 1057-58 (Nev. 2000). Further, the <u>Vitale</u> Court agreed with the Ninth Circuit's interpretation of California law stating that in the insurance context "waiver only applies in instances where the insurer engaged in misconduct, such as 'sandbagging' or failing to investigate a claim, or where the insured relied on an insurer's misrepresentation to his detriment." <u>Id.</u> at 1058-59. Because Defendants have not presented any evidence of misconduct in this case, but rather, have sought to extend coverage over a claim the policy expressly and unambiguously excludes, waiver does not apply.

## IV.     CONCLUSION

IT IS THEREFORE ORDERED that Plaintiff Prime Insurance Syndicate, Inc.'s Motion for Summary Judgment (Doc. #17) is hereby GRANTED.

IT IS FURTHER ORDERED that Judgment is hereby entered in favor of Prime and against Defendants.

DATED: January 19, 2007

_____
PHILIP M. PRO
Chief United States District Judge